IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

DOROTHY BROWN CLERK

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff,

v.

ABBOTT LABORATORIES; ALPHARMA, INC.;
ALPHA THERAPEUTIC CORP.; AMGEN INC.;
ASTRAZENECA PHARMACEUTICALS LP;
ASTRAZENECA LP; AVENTIS
PHARMACEUTICALS INC.; AVENTIS BEHRING,
LLC, n/k/a ZLB BEHRING; B. BRAUN OF
AMERICA, INC.; BARR PHARMACEUTICALS, INC.;
BAXTER INTERNATIONAL, INC.; BAYER CORP.;
BEN VENUE LABORATORIES, INC.; BOEHRINGER
INGELHEIM CORP.; BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.; BRISTOL-MYERS
SQUIBB CO.; CHIRON CORP.; DEY, INC.; ELKINS-
SINN, INC.; FOREST LABORATORIES, INC.;
IMMUNEX CORP.; IVAX CORP.; IVAX
PHARMACEUTICALS, INC.; JANSSEN
PHARMACEUTICAL PRODUCTS, LP;
JOHNSON & JOHNSON; McGAW, INC.; McNEIL-
PPC, INC.; MERCK & CO., INC.; MYLAN
LABORATORIES, INC.; MYLAN
PHARMACEUTICALS, INC.; NOVARTIS
PHARMACEUTICALS CORP.; NOVOPHARM USA,
INC.; ORTHO BIOTECH PRODUCTS, LP; ORTHO-
MCNEIL PHARMACEUTICAL, INC.; PAR
PHARMACEUTICAL COS., INC.; PFIZER INC.;
PHARMACIA CORP.; PUREPAC
PHARMACEUTICAL CO.; ROXANE
LABORATORIES, INC.; SANDOZ, INC., f/k/a
GENEVA PHARMACEUTICALS, INC.; SCHERING-
PLOUGH CORP.; SICOR PHARMACEUTICALS,
INC., f/k/a GENSIA SICOR PHARMACEUTICALS,
INC.; SMITHKLINE BEECHAM CORP., d/b/a
GLAXOSMITHKLINE; TAP PHARMACEUTICAL
PRODUCTS, INC.; TEVA PHARMACEUTICALS
USA, INC.; WARRICK PHARMACEUTICAL
INDUSTRIES, LTD.; WATSON PHARMA, INC.,
f/k/a SCHEIN PHARMACEUTICALS, INC.; and
WATSON PHARMACEUTICALS, INC.,

Defendants.

No.

05CH02474

THE HONORABLE DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
COOK COUNTY, IL

DATE: 2/7/2005    TIME: 3:36PM

DIST: 01 DIV: Chancery

CHECK NO: 10740
CHECK AMOUNT:        $274.

RECEIPT 0001 OF 0001
TRANSACTION TOTAL:
                     $274.
THANK YOU

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The plaintiff, PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, ATTORNEY GENERAL FOR THE STATE OF ILLINOIS, brings this action complaining of the above-captioned defendants as follows:

## NATURE OF THE ACTION

1. This action is brought in the public interest for and on behalf of the PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, ILLINOIS ATTORNEY GENERAL, pursuant to the Consumer Fraud and Deceptive Business Practices Act, the Public Assistance Fraud Act, the Whistleblower Reward and Protection Act, and the common-law authority of the Attorney General to represent the People of the State of Illinois.

2. The Attorney General brings this lawsuit on behalf of the State of Illinois for itself and in her *parens patriae* capacity on behalf of Illinois citizens to recover damages and injunctive relief from defendants, who are manufacturers of prescription drugs. As described in this complaint, defendants have taken advantage of the enormously complicated and non-transparent market for prescription drugs to engage in an unlawful scheme to cause the State of Illinois and its citizens to pay inflated prices for prescription drugs. The scheme involves the publication by defendants of phony "average wholesale prices" ("AWPs"), which then become the basis for calculating the cost at which "providers" -- the physicians and pharmacies who provide these prescription drugs to patients -- are reimbursed by the State of Illinois and its citizens. Defendants reinforce this basic tactic with other deceptive practices described in this complaint, including the use of secret discounts and rebates to providers and the use of various devices to keep secret the prices of their drugs currently available in the marketplace to other purchasers. By unlawfully engaging in this scheme, defendants have succeeded in having Illinois and its citizens finance windfall profits to these providers. Defendants attempt to profit from their scheme by using the lure of these windfall profits competitively to encourage providers to buy more of their drugs instead of competing in the marketplace solely on the basis of legitimate factors such as price and the medicinal value of their drugs.

## AUTHORITY

3. LISA MADIGAN is the Attorney General of Illinois, and in that capacity is authorized and empowered to enforce the Consumer Fraud and Deceptive Business Practices Act by Section 7 of the Act, which provides:

(a) Whenever the Attorney General or a State's Attorney has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by this Act to be unlawful, and that proceedings would be in the public interest, he or she may bring an action in the name of the People of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction; revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

(b) In addition to the remedies provided herein, the Attorney General or State's Attorney may request and the Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

(c) In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

815 ILCS §505/7.

4. LISA MADIGAN is the Attorney General of Illinois, and in that capacity is authorized and empowered to enforce the Public Assistance Fraud Act by §8A-7 of the Act, which provides:

(b) Any person, firm, corporation, association, agency, institution or other legal entity, other than an individual recipient, that willfully, by means of a false statement or representation, or by concealment of any material fact or by other fraudulent scheme or device on behalf of himself or others, obtains or attempts to obtain benefits or payments under this Code to which he or it is not entitled, or in a greater amount than that to which he or it is entitled, shall be liable for repayment of any excess benefits or payments received and, in addition to any other penalties provided by law, civil penalties consisting of (1) the interest on the amount of excess benefits or payments at the maximum legal rate in effect on the date the payment was made to such person, firm, corporation, association, agency,

institution or other legal entity for the period from the date upon which payment was made to the date upon which repayment is made to the State, (2) an amount not to exceed 3 times the amount of such excess benefits or payments, and (3) the sum of $2,000 for each excessive claim for benefits or payments. Upon entry of a judgment for repayment of any excess benefits or payments, or for any civil penalties assessed by the court, a lien shall attach to all property and assets of such person, firm, corporation, association, agency, institution or other legal entity until the judgment is satisfied.

(c)     Civil recoveries provided for in this Section may be recoverable in court proceedings initiated by the Attorney General....

305 ILCS §5/8A-7.

5. LISA MADIGAN is the Attorney General of Illinois, and in that capacity is authorized and empowered to enforce the Whistleblower Reward and Protection Act by §§3 and 4 of the Act, which provide:

Sec. 3. False claims.

(a)     Liability for certain acts. Any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;...or

(7)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State,

is liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the State sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages.

Sec. 4. Civil actions for false claims.

(a)     ...The Attorney General may bring a civil action under this Section against any person that has violated or is violating Section 3.

740 ILCS §§175/3 and 175/4.

## PARTIES AND JURISDICTION

6. LISA MADIGAN, Attorney General for the State of Illinois, brings this action on behalf of the State of Illinois and its citizens. As described in this complaint, defendants' unlawful scheme has resulted in higher prices for prescription drugs being paid by Illinois itself (as payer under the Medicaid program), and by citizens who pay for part of the cost of drugs under the Medicare program. The Attorney General has reason to believe that defendants have used and continue to use the methods, acts, and practices set forth in this complaint and which, among other violations, are illegal under the Illinois Consumer Fraud and Deceptive Business Practices Act, the Illinois Public Assistance Fraud Act, and the Illinois Whistleblower Reward and Protection Act, and that these proceedings are in the public interest.

7. Defendants are all pharmaceutical companies whose fraudulent schemes, including the publication of excessive and inflated prices for prescription drugs, as described in this complaint, have caused to be presented to officers and/or employees of the State of Illinois false or fraudulent claims for payment or approval of certain drugs to get these false or fraudulent claims paid or approved by the State of Illinois Medicaid program, and have resulted in Illinois and its citizens paying for drugs at inflated prices, as detailed below.

8. At all times material to this civil action, each defendant has transacted business in the State of Illinois by, including but not limited to, selling directly or through wholesalers its drugs, including those identified in this complaint, to purchasers within the State of Illinois.

9. Defendant Abbott Laboratories ("Abbott") is an Illinois corporation with its principal place of business at 100 Abbott Park Rd., Abbott Park, IL 60064-6400.

10. Defendant Alpha Therapeutic Corp. ("Alpha") is a California corporation with its principal place of business at 2410 Lillyvale Ave., Los Angeles, CA 90032.

11. The following two defendants are hereinafter referred to as the Alpharma group:

    (a)    defendant Alpharma, Inc. ("Alpharma") is a Delaware corporation in the business of manufacturing and selling pharmaceuticals. Alpharma's principal place of business is One Executive Dr., Ft. Lee, NJ 07024; and

(b)     defendant Purepac Pharmaceutical Co. ("Purepac") is a Delaware
corporation in the business of manufacturing and selling pharmaceuticals.
Purepac's principal place of business is 14 Commerce Dr., Ste. 301,
Cranford, NJ 07016. Purepac is a subsidiary of Alpharma.

12. The following two defendants are hereinafter referred to as the Amgen group:

(a)     defendant Amgen Inc. ("Amgen") is a Delaware corporation with its
principal place of business at One Amgen Dr., Thousand Oaks, CA 91320-
1799.

(b)     defendant Immunex Corp. ("Immunex"), a wholly-owned subsidiary of
Amgen since July 2002, is a Washington state corporation engaged in the
business of manufacturing and selling pharmaceuticals. Immunex's
principal place of business is located at 51 University St., Seattle, WA
98101. Immunex is also being sued for the conduct of its subsidiaries
and/or divisions, including but not limited to Lederle Oncology Corp.

13. Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca LP ("AstraZeneca")
are related Delaware corporations with their principal place of business at 1800 Concord Pike,
Wilmington, DE 19850.

14. The following two defendants are hereinafter referred to as the Aventis group:

(a)     defendant Aventis Pharmaceuticals Inc. is a Delaware corporation with its
principal place of business located at 300-400 Somerset Corporate Blvd.,
Bridgewater, NJ 08807-2854; and

(b)     defendant Aventis Behring, LLC, n/k/a ZLB Behring, is headquartered at
1020 First Ave., King of Prussia, PA 19406-0901.

15. Defendant Barr Pharmaceuticals, Inc. ("Barr") is a Delaware corporation with its
principal place of business located at 400 Chestnut Ridge Rd., Woodcliff Lake, NJ 07677. Barr
is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to
Barr Laboratories, Inc.

16. Defendant Baxter International, Inc. ("Baxter") is a Delaware corporation with its
principal place of business at One Baxter Pkwy., Deerfield, IL 60015.

17. Defendant Bayer Corp. ("Bayer") is an Indiana corporation with its principal place of
business located at 100 Bayer Rd., Pittsburgh, PA 15205-9741.

18. The following four defendants are hereinafter referred to as the Boehringer group:

(a)     defendant Boehringer Ingelheim Corp. ("Boehringer") is a Nevada
corporation engaged in the business of manufacturing and selling

pharmaceuticals. Boehringer's principal place of business is located at 900 Ridgebury Rd., Ridgefield, CT 06877;

(b)    defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer Pharm"), a wholly-owned subsidiary of Boehringer, is a Connecticut corporation engaged in the business of manufacturing and selling pharmaceuticals. Boehringer Pharm's principal place of business is located at 900 Ridgebury Rd., Ridgefield, CT 06877;

(c)    defendant Roxane Laboratories, Inc. ("Roxane"), a wholly-owned subsidiary of Boehringer, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Roxane's principal place of business is located at 1809 Wilson Rd., Columbus, OH 43216-6532; and

(d)    defendant Ben Venue Laboratories, Inc. ("Ben Venue"), a wholly-owned subsidiary of Boehringer, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Ben Venue's principal place of business is located at 300 Northfield Rd., Bedford, OH 44146. Ben Venue is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Bedford Laboratories.

19. The following two defendants are hereinafter referred to as the Braun group:

(a)    defendant B. Braun of America, Inc. ("B. Braun") is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals. B. Braun's principal place of business is located at 824 12th Ave., Bethlehem, PA 18018-0027. B. Braun is a wholly-owned subsidiary of B. Braun Melsunger Aktiengesellschaft; and

(b)    defendant McGaw, Inc. ("McGaw") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. McGaw's principal place of business is located at 824 12th Ave., Bethlehem, PA 18018-0027. (McGaw was formerly located in Irvine, California.) McGaw was acquired by B. Braun in 1997. Upon information and belief, McGaw is either a wholly-owned subsidiary of B. Braun or no longer has any corporate existence separate and apart from B. Braun.

20. Defendant Bristol-Myers Squibb Co. ("Bristol-Myers") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Bristol-Myers' principal place of business is located at 345 Park Ave., New York, NY 10154-0037. Westwood-Squibb ("Westwood") is a division of Bristol-Myers. Bristol-Myers is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Apothecon, Inc.

21. Defendant Chiron Corp. ("Chiron") is a corporation organized under the laws of Delaware with its principal place of business at 4560 Horton St., Emeryville, CA 94608-2916.

Chiron is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Cetus Oncology Corp.

22. Defendant Dey, Inc. ("Dey") is a Delaware corporation with its principal place of business at 2751 Napa Valley Corporate Dr., Napa, CA 94558.

23. Defendant Elkins-Sinn, Inc. ("Elkins") is a New Jersey corporation with its principal place of business at Two Esterbrook Ln., Cherry Hill, NJ 08003-4009.

24. Defendant Forest Laboratories, Inc. ("Forest") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Forest's principal place of business is located at 909 Third Ave., New York, NY 10022.

25. The following five defendants are hereinafter referred to as the Johnson & Johnson group:

    (a)    defendant Johnson & Johnson ("J&J") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. J&J's principal place of business is located at One Johnson & Johnson Plaza, New Brunswick, NJ 08933;

    (b)    defendant Janssen Pharmaceutical Products, LP ("Janssen"), a wholly-owned subsidiary of J&J, is a New Jersey limited partnership engaged in the business of manufacturing and selling pharmaceuticals. Janssen's principal place of business is located at 1125 Trenton-Harbourton Rd., Titusville, NJ 08560;

    (c)    defendant Ortho Biotech Products, LP ("Ortho Biotech"), a wholly-owned subsidiary of J&J, is a New Jersey limited partnership engaged in the business of manufacturing and selling pharmaceuticals. Ortho Biotech's principal place of business is located at 700 U.S. Hwy. 202, Raritan, NJ 08869;

    (d)    defendant Ortho-McNeil Pharmaceutical, Inc. ("Ortho McNeil"), a wholly-owned subsidiary of J&J, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Ortho-McNeil's principal place of business is located at 1000 U.S. Rte. 202 S., Raritan, NJ 08869; and

    (e)    defendant McNeil-PPC, Inc. ("McNeil"), a wholly-owned subsidiary of J&J, is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. McNeil's principal place of business is located at 7050 Camp Hill Rd., Ft. Washington, PA 19034. McNeil Consumer & Specialty Pharmaceuticals ("McNeil Cons") is a division of McNeil.

26. The following two defendants are hereinafter referred to as the Ivax group:

    (a)    defendant Ivax Corp. ("Ivax") is a Florida (formerly Delaware) corporation engaged in the business of manufacturing and selling pharmaceuticals. Ivax's principal place of business is located at 4400 Biscayne Blvd., Miami, FL 33137; and

    (b)    defendant Ivax Pharmaceuticals Inc. ("Ivax Pharm"), a wholly-owned subsidiary of Ivax, is a Florida corporation engaged in the business of manufacturing and selling pharmaceuticals. Ivax Pharm's principal place of business is located at 4400 Biscayne Blvd., Miami, FL 33137.

27. Defendant Merck & Co., Inc. ("Merck") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. Merck's principal place of business is located at One Merck Dr., Whitehouse Station, NJ 08889-0100.

28. The following two defendants are hereinafter referred to as the Mylan group:

    (a)    defendant Mylan Laboratories, Inc. ("Mylan") is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals, mainly through its subsidiaries. Mylan's principal place of business is located at 1500 Corporate Dr., Ste. 400, Canonsburg, PA 15317; and

    (b)    defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharm"), a wholly-owned subsidiary of Mylan, is a West Virginia corporation engaged in the business of manufacturing and selling pharmaceuticals. Mylan Pharm's principal place of business is located at 1500 Corporate Dr., Ste. 400, Canonsburg, PA 15317.

29. The following two defendants are hereinafter referred to as the Novartis group:

    (a)    defendant Novartis Pharmaceuticals Corp. ("Novartis") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. Novartis' principal place of business is located at One Health Plaza, East Hanover, NJ 07936; and

    (b)    defendant Sandoz, Inc. ("Sandoz"), formerly known as Geneva Pharmaceuticals, Inc., is a wholly-owned subsidiary of Novartis. Sandoz is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Sandoz's principal place of business is located at 506 Carnegie Ctr., Princeton, NJ 08540.

30. Defendant Par Pharmaceutical Cos., Inc. ("Par") is a Delaware corporation with its principal place of business located at One Ram Ridge Rd., Spring Valley, NY 10977. Par is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Par Pharmaceutical, Inc.

31. Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its principal place of business at 235 E. 42nd St., New York, NY 10017. In April, 2003, Pfizer acquired Pharmacia Corp. Pfizer is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Warner-Lambert, Pfizer-Warner-Lambert, and Parke-Davis.

32. Defendant Pharmacia Corp. ("Pharmacia") is a Delaware corporation with its principal place of business located at 100 Rte. 206 N., Peapack, NJ 07977. Pharmacia was created through the merger of Pharmacia and Upjohn, Inc., and Monsanto Co. on March 31, 2000. Pharmacia was acquired by defendant Pfizer in 2003.

33. The following two defendants are hereinafter referred to as the Schering group:

(a) defendant Schering-Plough Corp. ("Schering-Plough") is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Rd., Kenilworth, NJ 07033-0530. Schering-Plough has engaged in the practices described in this complaint under its own name and through its wholly-owned subsidiary, Warrick Pharmaceutical Industries, Ltd.; and

(b) defendant Warrick Pharmaceuticals Industries, Ltd. ("Warrick"), is a Delaware corporation with its principal place of business at 12125 Moya Blvd., Reno, NV. Warrick is a wholly-owned subsidiary of defendant Schering-Plough and has been since its formation in 1993. Warrick manufactures generic pharmaceuticals.

34. Defendant SmithKline Beecham Corp., d/b/a GlaxoSmithKline ("GlaxoSmithKline"), is a Delaware corporation with its principal place of business at One Franklin Plaza, Philadelphia, PA 19102.

35. Defendant TAP Pharmaceutical Products, Inc. ("TAP") is a Delaware corporation headquartered at Bannackburn Lake Office Plaza, 2355 Waukegan Rd., Deerfield, IL 60015. TAP is jointly owned by Abbott Laboratories and Takeda Chemical Industries, Ltd.

36. The following three defendants are hereinafter referred to as the Teva group:

(a) defendant Teva Pharmaceuticals USA, Inc. ("Teva US") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Teva's principal place of business is located at 650 Cathill Rd., Sellersville, PA 18960. Teva US is a subsidiary of an Israeli corporation, Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.");

(b) defendant Novopharm USA, Inc. ("Novopharm") is a Delaware corporation with its principal place of business located at 165 E. Commerce Dr., Ste. 100-201, Schaumburg, IL 60173-5326. Novopharm is owned by Teva; and

(c) . defendant Sicor Pharmaceuticals, Inc., f/k/a Gensia Sicor Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business at 19 Hughes, Irvine, CA 92618-1902. Sicor is owned by Teva.

37. The following two defendants are hereinafter referred to as the Watson group:

(a) defendant Watson Pharma, Inc., f/k/a Schein Pharmaceuticals, Inc. ("Watson Pharma"), a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. since 2000, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Watson Pharma's principal place of business is located at 311 Bonnie Cir., Corona, CA 92880; and

(b) defendant Watson Pharmaceuticals, Inc. ("Watson") is a Nevada corporation engaged in the business of manufacturing and selling pharmaceuticals. Watson's principal place of business is located at 311 Bonnie Cir., Corona, CA 92880.

38. This Court has jurisdiction over plaintiff's claims as they involve claims arising exclusively under Illinois statutes and the *parens patriae* authority of the Attorney General to act on behalf of the State of Illinois and its citizens.

39. Venue is proper in Cook County, Illinois because injuries to plaintiff occurred in Cook County, Illinois and because defendants committed unlawful, acts and/or practices in Cook County, Illinois.

## THE MARKET FOR PRESCRIPTION DRUGS

40. The market for prescription drugs is enormously complex and non-transparent. It is composed of over 65,000 separate national drug codes ("NDCs") (there is a separate NDC number for each quantity of each drug manufactured by each defendant). The essential structure of the market is as follows. The drugs themselves are manufactured by enormous and hugely-profitable companies such as defendants. Defendants sell the drugs (with varying numbers of intermediaries and agents involved in the process) to physicians, hospitals, and pharmacies. These physicians, hospitals, and pharmacies are commonly known as "providers." The providers then, in essence, resell the drugs to their patients when the drugs are prescribed for, administered or dispensed to those patients. Most patients have private or public health-insurance coverage. Where a patient has such insurance, the price that is paid for the patient's prescribed drug

-10-

ultimately will be paid, in whole or in large part, by a private insurance company, a self-insured entity, or a government entity (in the case of Medicare and Medicaid programs). These private insurance companies, self-insured entities, and government entities are commonly known as "payers." More often than not, the payer will make the reimbursement payment directly to the provider, not to the patient.

41. This market structure means that the market for prescription drugs differs in two crucial respects from most markets.

42. First, in most markets, demand for a product is determined by the ultimate consumers of the product. This is not the case for prescription drugs. In the prescription-drug market, the decision to use a prescription drug is overwhelmingly made not by the recipient of the drug -- the patient -- but by physicians, hospitals in which the patient is treated, home health-care agencies, long-term care facilities, or (with respect to the decision to use generic drugs versus brand-name drugs) a pharmacy. Because prescription drugs are dispensed only on a physician's order, the physician has the principal say in what drug will be chosen for the patient. However, hospitals, particularly teaching hospitals, also have considerable influence over this choice. If a hospital decides to put one drug as opposed to a competing drug on its "formulary" (the list of drugs that the hospital stocks), the result will be that the physicians (particularly residents and attending physicians who are employed by the hospital) will likely order that drug rather than a competing drug. Likewise, although pharmacies do not prescribe drugs, pharmacies can exert important influence over the choice of which drug the patient will purchase if there is a choice between buying the generic version or the brand-name version of the drug which the physician has prescribed.

43. A second difference of the prescription-drug market from more ordinary markets is that in ordinary markets, the ultimate consumer of the product pays for it directly. In the prescription-drug market, however, most payments for drugs are made by "payers" through private or public insurance programs.

44. This structure of the prescription-drug market produces the following fundamental fact that underlies defendants' unlawful scheme. If a defendant drug manufacturer can cause a "payer" to reimburse for defendant's drug at a higher price than the price the provider paid to buy the drug from the defendant, there will be a "spread" between the two prices, and that "spread" is retained by the provider as additional profit. The larger the "spread" that can be created for a particular drug, the greater the incentive the provider has for choosing, or for influencing the choice of, that drug rather than a drug of a competing manufacturer.

## DEFENDANTS' AWP MARKETING SCHEME

45. Defendants have engaged in a scheme to maximize the "spread" by maximizing the prices at which Illinois and Illinois citizens reimburse providers for defendants' drugs. The scheme takes advantage of the fact that the Medicaid and Medicare programs depend on defendants' published wholesale prices for reimbursement guidance.

46. Each of the defendants and/or its subsidiaries has for years identified an AWP and, more recently, a price denominated as wholesale-acquisition cost ("WAC") (or similar terms used to denote either a drug's cost to the wholesaler or the price charged by the wholesaler) for most of their drugs. These prices are disseminated to the public by the defendants through publication in certain medical compendiums. Among the most prominent of these are the *Drug Topics Red Book* and *First Databank Annual Directory of Pharmaceuticals*. These publications rely on the prices reported to them by the defendants. These are the only prescription-drug prices that defendants make public.

47. For many years Illinois, as a payer under the Medicaid program, has based its reimbursement formula for prescription drugs on the defendants' published AWPs. Illinois has depended on these prices for many reasons. First, simplified and reliable estimates of the cost of drugs prescribed for Illinois citizens are needed because the huge number of different drugs and the non-transparency of the marketplace make it impracticable for Illinois to track the drug-price changes drug-by-drug on a daily basis. Second, the AWPs come directly from the defendants,

the most knowledgeable source. Third, by using the term "average wholesale price," defendants convey that term's commonly understood meaning -- that the price is an average of actual prices that are charged by wholesalers. Fourth, the compendiums in which these prices are published are widely used and respected. Fifth, these published prices are the only prices publicly available. Sixth, defendants conceal the true cost of their drugs as set forth below. Seventh, Illinois depends on the honesty of those who profit from Illinois' Medicaid assistance programs and other state programs.

48. As a result, Illinois' drug reimbursement system has been and remains almost completely dependent on defendants' reported wholesale prices. Defendants know this fact and rely on it to make their AWP scheme work.

49. Defendants have illegally misrepresented the true AWP for virtually all of their drugs. One purpose of this scheme was and is to create the spread between the true wholesale price of a drug and the false and inflated AWP and thereby increase the incentive for providers to choose the drug for their patients, or, at a minimum, to counteract the same tactic used by a competitor, because, if competing manufacturers are also publishing false and inflated AWPs for their drugs, a given defendant will be at a competitive disadvantage unless it does the same for its own drugs. For example, Dey brought a lawsuit against First DataBank, the publisher of the medical compendium that Illinois Medicaid relies on for prescription-drug pricing, because it published the *true* AWP of Dey's drugs instead of the false AWP sent to the publisher by Dey. Dey's principal allegation in that lawsuit was that the publication of its actual prices for drugs was inconsistent with the practice in the industry of accepting and publishing reported, inflated AWPs, and that such publication put Dey at a competitive disadvantage because it had no "spread" to advertise.

50. The higher the spread between the AWP and the price reflected in defendants' business records the provider pays, the more profit a provider can make. Defendants often market their products by pointing out (explicitly and implicitly) that their drug's spread is higher than that of a competing drug.

-13-

51. One example of how defendants market this spread is Adriamycin, a drug used in treating breast cancer. Defendant Pharmacia reported an AWP of $241.36 for Adriamycin in April, 2000, when it was actually selling the drug wholesale for as low as $33.43, creating a "spread" of $207.92. These spreads were then advertised to oncology providers in promotions which emphasized a wide profit margin.

52. All of the defendants have inflated their reported average wholesale prices to levels far beyond the true average wholesale price of their drugs and those of their subsidiaries. One high-ranking industry executive has described it as the industry practice to do so.

53. Attached as Exhibit A to this complaint is a list of drugs manufactured by defendants and/or their subsidiaries that the U.S. Department of Justice, after an extensive investigation, found to have inflated AWPs. The U.S. Department of Health and Human Services concluded, with respect to all drugs utilized in the Medicare Program that "[a] general conclusion reached in reviewing GAO [General Accounting Office] and OIG [Office of Inspector General of DHSS] data is that there is a level of overstatement in the list AWP for *all* drugs...." Payment Reform for Part B Drugs, 68 Fed. Reg. 50,430 (August 20, 2003) (emphasis added).

54. Examples of defendants' practices of inflating AWPs are the following:

| Manufacturer/Drug | 2000 AWP | 2000 Available Price | Spread | % Spread |
|---|---|---|---|---|
| Abbott/Amikacin Sulfate | $1,212.44 | $150.00 | $1,062.44 | 708% |
| Baxter/Dextrose | $ 542.88 | $ 86.40 | $ 456.48 | 528% |
| Schering-Plough/ Albuterol Sulfate | $ 72.60 | $ 21.92 | $ 50.68 | 231% |

55. Exhibits B and C contain additional examples of drugs manufactured by defendants with inflated AWPs. Exhibit D contains summaries of spreads for defendants' pharmaceuticals. Although the data supporting the summaries are too voluminous to attach to the complaint, they will be made available to defendants upon request. Plaintiff has continued to obtain information

-14-

relating to defendants' publication of the prices of their drugs, including complaints filed by other states and prices available to buyers other than Illinois' Medicaid program, and have found that the evidence uniformly supports the conclusion that defendants have pervasively inflated their published wholesale prices.

56. Defendants have similarly unfairly, illegally, and deceptively misrepresented and inflated the WAC of their drugs, making it appear that any reduction in the purchase price beyond the listed WAC would result in a loss to the wholesaler and was, hence, unachievable when, in fact, the WAC was secretly discounted to purchasers other than the Medicaid and Medicare programs through an elaborate charge-back system.

## DEFENDANTS' EXACERBATION OF THE COMPLEXITIES OF THE MARKET AND AFFIRMATIVE CONCEALMENT OF THEIR WRONGDOING

57. Defendants have been able to succeed in their drug-pricing scheme for more than a decade by exacerbating the complexities of the incredibly huge, and dauntingly complex, drug market, and by purposely concealing their scheme from Illinois and other payers, as set forth below.

58. The published wholesale price of the over 65,000 NDC-numbered drugs may, and often does, change at any time. As a consequence, just to track the current published prices of drugs utilized by a state's citizens requires resources and expertise that most states do not have.

59. Defendants have further exacerbated the inherent complexities of the drug market by utilizing marketing schemes which conceal the true price of their drugs in several different ways.

60. First, defendants sell their drugs in a unique manner which hides the true price of their drugs. This scheme works as follows. Upon agreeing on a quantity and price of a drug with a provider, or group of providers, the defendants purport to sell the agreed-upon drugs to wholesalers with whom they have a contractual arrangement, at the WAC price. The WAC may be, and usually is, higher than the price agreed upon by the provider and the drug manufacturer. The wholesaler then ships the product to the provider, charging the provider the (lower) price originally agreed upon by the drug manufacturer and the provider. When the wholesaler receives

payment from the provider, it charges the manufacturer the price for handling and any applicable rebates and discounts, and sends a bill to the manufacturer, called a "charge-back," for the difference between the WAC and the price actually paid by the provider. These charge-backs (or shelf adjustments, or other economic inducements) are kept secret, so that it appears that the wholesaler actually purchased the drug at the higher WAC price. The effect of this practice is to create the impression that the "wholesale price" of the drug is higher than it really is.

61. Second, defendants further inhibit the ability of Illinois and other ultimate purchasers to learn the true cost of their drugs by insisting upon confidentiality provisions in their sales agreements with providers, terming them trade secrets and proprietary, to preclude providers from disclosing to others the prices they paid.

62. Third, defendants further obscure the true prices for their drugs with their policy of treating different purchasers differently. Thus, for the same drug, pharmacies are given one price, hospitals another, and doctors yet another.

63. Fourth, at least some defendants have hidden their real drug prices by providing free drugs and phony grants to providers as a means of discounting the overall price of their drugs. For example, defendant TAP has pled guilty to a federal criminal indictment for engaging in such conduct, as have defendants AstraZeneca, Pfizer, and Schering-Plough.

64. Defendants have concealed or refused to disclose their motive for utilizing an inflated AWP from the public. Only with the disclosure of materials secured by litigants in recent discovery has it become apparent that at least one reason defendants were intentionally manipulating the nation's drug-reimbursement system was to compete for market share on a basis of a phony price spread instead of the true selling price of their drugs or the medicinal value of these drugs to their users.

65. Defendants have further concealed their conduct by ensuring that all of the entities purchasing drugs directly from defendants (and, hence, knowledgeable about the true price of their drugs) have had an incentive to keep defendants' scheme secret. Defendants' scheme permits all providers, including but not limited to pharmacies, physicians, and hospitals/clinics,

-16-

to make some profit off defendants' inflated spread, because all of them are reimbursed on the basis of the AWP for at least some of the drugs they sell or administer. For providers, therefore, the greater the difference between the actual price and the reported AWP, the more money they make.

66. Defendants have continuously concealed the true price of their drugs and continued to publish deceptive AWPs and WACs as if the prices were real, representative prices.

67. Although from time to time reports have emerged which indicate one drug or another, at one time or another, could be purchased for less than the AWP, for many reasons, Illinois has been powerless to either discover the nature of defendants' fraud or arrest it. First, defendants have fraudulently concealed their scheme by publishing AWPs and WACs as if they were true prices and by hiding their true prices through elaborate coverups. To this day, Illinois is uncertain as to the true wholesale prices of defendants' drugs. Second, only recently has the outline of defendants' scheme become known. Indeed, as late as 2000, the United States Congress was sufficiently confused by what defendants were doing that it directed the General Accounting Office to launch a full-scale investigation of the market. And it was not until 2003 that the U.S. Department of Health and Human Services was able to modify the Medicare reimbursement system for drugs. Third, the motive for defendants engaging in this scheme -- the belief that a larger spread enhances sales prospects -- has only recently been discovered, making it clear, for the first time, that the disparities between reported AWPs and true prices were not simply a result of transient market forces but rather the result of a purposefully-deceptive scheme by the defendants. Fourth, as a public-policy matter, it is impracticable to respond effectively to evidence that some drugs, at some time, for some reason, have AWPs higher than their actual purchase price. Plaintiff does not have the resources to investigate each drug company to validate the reported prices of over 65,000 NDCs on an ongoing basis. If plaintiff unknowingly reduced its levels of reimbursement to below that which the providers actually pay for drugs, the providers would simply stop supplying the drugs, to the detriment of Illinois citizens. Thus, although plaintiff has now uncovered the outline of defendants' unlawful scheme, the damage

resulting to the state and its citizens from defendants continues unabated and will continue until plaintiff learns the true wholesale prices of defendants' drugs.

68. Defendants' unlawful scheme has completely corrupted the market for prescription drugs. Instead of competing on prices and medicinal value alone, the defendants have deliberately sought to create a powerful financial incentive for providers to prescribe drugs based on the spread between the true price of a drug and its published AWP or WAC. Creating incentives for providers to prescribe drugs based on such a spread is inconsistent with Illinois' public policy. Large price spreads on higher-priced drugs encourage providers to prescribe more expensive drugs instead of their lower-priced substitutes, thereby increasing the cost of health care. Competition on the basis of such spreads has the potential to influence (consciously or unconsciously) providers to prescribe less efficacious drugs. Because of defendants' concealment of their scheme, Illinois and its citizens have underwritten this perversion of competition in the drug market. In sum, defendants have been, and continue to be, engaged in an insidious, fraudulent scheme that is causing Illinois and its citizens to pay millions of dollars a year more than they should for their prescription drugs, and may well be inducing some providers to prescribe less efficacious drugs.

### THE INJURY TO GOVERNMENTAL HEALTH PLANS
### CAUSED BY DEFENDANTS' FALSE WHOLESALE PRICES

A. The Illinois Medicaid program.

69. Medicaid is a joint federal and state health-care entitlement program authorized by federal law, with mandatory and optional provisions for eligibility and benefits covered, including pharmacy. Illinois Medicaid has several major programs including: (a) Medicaid, which provides for very low-income children, parents, pregnant women, and elderly and disabled adults; (b) SeniorCare, which provides for certain senior citizens; and (c) KidCare, which provides for certain children.

70. Illinois Medicaid drug expenditures have increased dramatically. In fiscal year 1999 (covering the period July 1, 1998 to June 30, 1999), Illinois Medicaid drug expenditures totaled approximately $600 million. In fiscal year 2005 (covering the period July 1, 2004 to June 30, 2005), Illinois Medicaid drug expenditures are projected to total $2.1 billion, which constitutes approximately 16% of the overall Medicaid budget. As of December 2004, the number of Illinois citizens enrolled in Medicaid is approximately 1.8 million, which represents approximately 14% of the state population.

71. With some exceptions, reimbursement to pharmacies, physicians, and hospitals for drugs covered by the Illinois Medicaid program is made at defendants' published AWP minus a percentage (currently 12%), plus other fees.

72. At all times, each defendant was aware of the reimbursement formula used in the Illinois Medicaid program and the dependence of the Medicaid program on defendants' reported AWP.

73. By publishing false and inflated wholesale prices, and by keeping their true wholesale prices secret, defendants have knowingly enabled providers of drugs to Medicaid recipients to charge Illinois false and inflated prices for these drugs, and interfered with Illinois' ability to set reasonable reimbursement rates for these drugs.

74. As a consequence, Illinois' Medicaid program has paid more for prescription drugs than it would have paid if defendants had published their true wholesale prices.

B. Damage to Illinois citizens who are Medicare, Part B, recipients.

75. Medicare is a health-insurance program created by the federal government for the elderly and disabled and other eligible persons. 42 U.S.C. §1395, *et seq.* Typically, individuals become eligible for Medicare health-insurance benefits if they are over 65 years of age, disabled, or have end-stage renal disease. There are two major components of the Medicare Program, Part A and Part B.

-19-

76. Medicare, Part B is an optional program that provides coverage for some health-care services for Illinois' participating elderly and disabled citizens not covered by Part A. 42 U.S.C. §§1395j-1395w-4. Medicare, Part B is supported by government funds and premiums paid by eligible individuals who choose to participate in the program.

77. At issue here is Medicare, Part B's limited benefit for drugs which are provided to patients either: (a) incident to a physician's service and cannot generally be self-administered; or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other durable medical equipment ("DME") payable under Medicare's DME benefit.

78. In order to calculate the portion Medicare recipients must pay for Part B benefits, the Medicare program has generally looked to the falsely-reported AWPs. For example, from January 1, 1999, the methodology for calculating the allowable cost of multiple-source drugs and biologicals is 95% of the lesser of the median AWP for all sources of the generic forms of the drug or biological or lowest AWP of the brand-name form of the drug or biological. 42 C.F.R. §405.517. Medicare then pays 80% of the allowable cost. The remaining 20% is paid as a co-payment by the Medicare, Part B, beneficiary, or for individuals eligible for Medicaid (known as "dual eligibles"), by the Medicaid program. In addition, Medicare, Part B, beneficiaries are required to pay an annual deductible amount before Part B benefits are payable.

79. Because Medicare, Part B, participants must pay 20% of the allowable cost, which is based on the AWP, for their medications, and because defendants have published false and inflated AWPs for their drugs, Medicare, Part B, participants are paying substantially more for their co-pay -- either directly or through higher insurance premiums defraying the cost of this co-pay -- than they would pay if defendants had published their true wholesale prices. Indeed, with respect to at least some drugs, the 20% co-pay for the Medicare, Part B, participant is greater than the entire cost of the drug.

## HARM TO ILLINOIS AND ITS CITIZENS

80. Defendants' unlawful activities have significantly impacted Illinois and its citizens. Illinois has had to pay higher prices for the drugs it reimburses through its Medicaid program. Illinois Medicare, Part B, participants, who are primarily elderly and disabled citizens, have had to pay higher co-pays for their prescriptions than if defendants had truthfully reported the wholesale prices of their drugs.

### COUNT I

Violation of the Illinois Consumer Fraud and
Deceptive Business Practices Act ("CFA"),
815 ILCS §505/2 (Unlawful Practices)

81. Plaintiff hereby realleges all previous paragraphs.

82. Section 2 of the Illinois CFA declares unlawful any

[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact...in the conduct of any trade or commerce... whether any person has in fact been misled, deceived or damaged thereby.

83. By committing the acts alleged above, defendants have violated §2 of the Illinois CFA by engaging in unfair and/or deceptive practices, including, but not limited to, the misrepresentation, concealment, suppression, or omission of material facts, while participating in trade or commerce with the knowledge and/or intent that the State of Illinois and others would rely on their deceptive conduct.

84. Illinois and its citizens participating in the Medicare, Part B, program have been harmed by defendants' unfair and/or deceptive conduct in falsely inflating their AWPs in that they have paid far more for the drugs manufactured by defendants than they would have paid had defendants truthfully reported the AWPs of their drugs.

WHEREFORE, plaintiff prays that this Court:

(a)     declare that defendants' conduct as described above constitutes unfair
and/or deceptive acts or practices within the meaning of §2 of the Illinois
CFA;

(b)     grant judgment for plaintiff;

(c)     permanently enjoin defendants and their employees, officers, directors, agents, successors, assigns, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and any and all persons acting in concert or participation with defendants, from continuing the unlawful conduct, acts, and practices described above;

(d)     award plaintiff State of Illinois and its citizens who have been harmed by defendants' practices, restitution and actual damages for all excessive prescription-drug payments and co-payments paid as a result of defendants' unlawful conduct;

(e)     award penalties for each violation found by the Court to have been committed by a defendant with the intent to defraud in the amount of $50,000.00 pursuant to 815 ILCS §505/7(b), and penalties in the amount of $10,000.00 for each violation found by the Court to have been committed against a person 65 years of age or older pursuant to 815 ILCS §505/7(c);

(f)     award plaintiff its costs and attorneys' fees; and

(g)     award any other relief to which plaintiff is entitled or the Court deems appropriate and just.

## COUNT II

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") 815 ILCS §505/2-CC (Wholesale Advertising)

85.  Plaintiff hereby realleges all previous paragraphs.

86.  Section 2-CC(b) of the Illinois CFA declares it an unlawful practice to represent directly or by implication in any advertising that a person offers to or sells a particular article of merchandise at a wholesale price unless that person can substantiate significant savings on his price as compared to identical merchandise offered for sale by retailers in the trade area.

87.  Defendants' conduct in causing to have published wholesale prices that were and are significantly greater than the true AWPs for drugs paid by pharmaceutical retailers (pharmacists and health-care providers) without any significant savings on the price, as compared to identical merchandise offered by retailers in the trade area was, and is, an unfair and/or deceptive act within the meaning of §2-CC(b) of the Illinois CFA.

88. Illinois and its citizens participating in the Medicare, Part B, program have been harmed by defendants' unfair and/or deceptive conduct in falsely inflating their AWPs in that they have paid far more for the drugs manufactured by defendants than they would have paid had defendants truthfully reported the AWPs of their drugs.

WHEREFORE, plaintiff prays that this Court:

(a) declare that defendants' conduct as described above constitutes unfair and/or deceptive acts or practices within the meaning of §2-CC(b) of the Illinois CFA;

(b) grant judgment for plaintiff;

(c) permanently enjoin defendants and their employees, officers, directors, agents, successors, assigns, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and any and all persons acting in concert or participation with defendants, from continuing the unlawful conduct, acts, and practices described above;

(d) award plaintiff State of Illinois and its citizens who have been harmed by defendants' practices, restitution and actual damages for all excessive prescription-drug payments and co-payments paid as a result of defendants' unlawful conduct;

(e) award penalties for each violation found by the Court to have been committed by a defendant with the intent to defraud in the amount of $50,000.00 pursuant to 815 ILCS §505/7(b), and penalties in the amount of $10,000.00 for each violation found by the Court to have been committed against a person 65 years of age or older pursuant to 815 ILCS §505/7(c);

(f) award plaintiff its costs and attorneys' fees; and

(g) award any other relief to which plaintiff is entitled or the Court deems appropriate and just.

## COUNT III

### Violation of the Illinois Public Assistance Fraud Act ("IPAFA"), 305 ILCS §5/8A-7(b) (Vendor Fraud)

89. Plaintiff hereby realleges all previous paragraphs.

90. Section 7(b) of the IPAFA declares it an unlawful act for any person or business "willfully, by means of a false statement or representation, or by concealment of any material fact or by other fraudulent scheme" to "obtain[] or attempt[] to obtain benefits or payments under this

Code to which he or it is not entitled, or in a greater amount than that to which he or it is entitled."

91. Defendants' conduct in causing (a) the publication of wholesale prices that were and continue to be significantly greater than the true AWPs for drugs paid by pharmaceutical retailers (pharmacists and health-care providers); and (b) the utilization of marketing schemes to conceal the true price of their drugs; was, and continues to be, an unlawful act within the meaning of §7(b) of the IPAFA.

92. As a direct result of defendants' conduct, defendants have caused damages to the Illinois Medicaid program in that plaintiff has paid far more for the drugs manufactured by defendants than they would have paid had defendants truthfully reported the AWPs of their drugs.

WHEREFORE, plaintiff prays that this Court:

(a)    declare that defendants' conduct as described above violates §7(b) of the IPAFA;

(b)    grant judgment for plaintiff;

(c)    permanently enjoin defendants and their employees, officers, directors, agents, successors, assigns, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and any and all persons acting in concert or participation with defendants, from continuing the unlawful conduct, acts, and practices described above;

(d)    award plaintiff an amount equal to the excess benefits or payments received by each defendant plus (1) penalties equal to interest on the amount of excess benefits or payments at the maximum legal rate in effect on the date the payment was made; (2) an amount not to exceed three times the amount of such excess benefits or payments; and (3) the sum of $2,000.00 for each excess claim for benefits or payment;

(e)    award plaintiff its reasonable and necessary costs of investigation and prosecution of this case, including actual attorneys' fees; and

(f)    award any other relief to which plaintiff is entitled or the Court deems appropriate and just.

## COUNT IV

### Violation of the Illinois Whistleblower Reward and Protection Act, 740 ILCS §175/1, et seq.

93. Plaintiff hereby realleges all previous paragraphs.

94. Sections 3(a)(1), (2), and (7) of the Illinois Whistleblower Reward and Protection Act declare it an unlawful act for any person to (a) "knowingly present[], or cause[] to be presented, to an officer or employee of the state...a false or fraudulent claim for payment or approval"; (b) "knowingly make[], use[], or cause[] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state"; or (c) "knowingly make[], use[], or cause[] to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state," respectively.

95. Defendants' conduct in causing (a) the publication of wholesale prices that were significantly greater than the true AWPs for drugs paid by pharmaceutical retailers (pharmacists and health-care providers) which defendants knew the State of Illinois would base its reimbursement formula for prescription drugs on; (b) the State of Illinois, in reliance on the falsely-inflated AWPs, to pay out sums of money to the providers and suppliers of defendants' drugs, significantly in excess of the amounts permitted by law; and (c) preventing the State of Illinois from recouping state funds paid in excess of the amounts the state would have paid had defendants truthfully reported the AWPs of their drugs, violated §3(a) of the Illinois Whistleblower Reward and Protection Act.

96. As a direct result of defendants' conduct, defendants caused the State of Illinois to pay out sums of money to providers and suppliers of defendants' drugs grossly in excess of the amounts they would have paid had defendants truthfully reported the AWPs of their drugs, resulting in great financial loss to the State of Illinois.

WHEREFORE, plaintiff prays that this Court:

(a)     declare that the conduct of each defendant, as described above, violates §§3(a)(1), (2), and (7) of the Illinois Whistleblower Reward and Protection Act;

(b)    grant judgment for plaintiff and against each defendant;

(c)    award plaintiff State of Illinois from each defendant civil penalties equal to three times the amount of damages which the State of Illinois sustained because of defendants' violations, plus no more than $10,000.00 and no less than $5,000.00 for each false or fraudulent claim pursuant to 740 ILCS §175/3(a);

(d)    award plaintiff State of Illinois all fees and costs of this civil action, including attorney's fees; and

(e)    award any other relief to which the State of Illinois is entitled or the Court deems appropriate and just.

Respectfully submitted,

LISA MADIGAN
Attorney General of the State of Illinois

By:    _____
Benjamin C. Weinberg
Assistant Attorney General

By:    _____
Judson H. Miner
Special Assistant Attorney General
of the State of Illinois

Judson H. Miner
Charles Barnhill, Jr.
George F. Galland, Jr.
Jeffrey I. Cummings
Robert S. Libman
Marni Willenson
Special Assistant Attorneys General
Miner, Barnhill & Galland
14 W. Erie St.
Chicago, IL 60610
(312) 751-1170
Atty No. 21402

Benjamin C. Weinberg
Paul J. Gaynor
David F. Buysse
Assistant Attorneys General
100 W. Randolph St.
Chicago, IL 60601
(312) 814-6141